UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

STEVEN EDWARD COOKE, JR.,

               Plaintiff,         Civil Action No. 18-cv-11230
                                          Honorable Sean F. Cox
                                          Magistrate Judge David R. Grand
v.

THE COUNTY OF ST. CLAIR,
TIM DONNELLON, SHERIFF,
BILL SLUSHER, CMH SV.,
DAVID SZELOG, SERGEANT

               Defendants.
_____/

**REPORT AND RECOMMENDATION TO GRANT DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT (ECF Nos. 55, 58)**

### I. REPORT

In this *pro se* prisoner civil rights action, plaintiff Steven Edward Cooke, Jr. ("Cooke") asserts claims related to events that occurred while he was a pretrial detainee at the St. Clair County Jail (the "Jail") from November 1, 2017, to June 28, 2018. During that timeframe, Cooke was evaluated for mental health services on multiple occasions by St. Clair County Community Mental Health ("CMH") employees, including its Manager of Mental of Mental Health Coordination Services for services provided at the Jail, defendant Bill Slusher ("Slusher"). After each of the first few evaluations, Slusher and other CMH employees determined that Cooke did not qualify for mental health services other than the provision of medication. Cooke contends that those evaluations reached the wrong conclusion, and that he should have received additional mental health treatment, such as group and/or one-on-one therapy. Cooke contends that the failure to provide him with such treatment constituted deliberate indifference to his serious medical needs

1

in violation of his Eighth Amendment rights by defendants CMH and Slusher, as well as by defendant Tim Donnellon ("Donnellon"), the St. Clair County Sherriff who oversaw the Jail, and defendant David Szelog ("Szelog"), a St. Clair County Jail Sergeant.  Cooke also asserts a First Amendment retaliation claim against defendant Szelog related to Szelog's threats to discipline Cooke for filing grievances.  Finally, Cooke asserts constitutional claims against Donnellon and Szelog related to instances where he allegedly was denied a grievance form.

Before the Court are two motions for summary judgment, one filed by Sheriff Donnellon and Sergeant Szelog on August 1, 2019, and another filed by CMH and Slusher on August 23, 2019.  (ECF No. 55, No. 58.)  Cooke filed separate responses to these motions.  (ECF No. 59; No. 61.)[1]  Donnellon and Szelog filed a reply, as did CMH and Slusher (ECF No. 60, No. 62.)

Pursuant to 28 U.S.C. § 636(b), the Honorable Sean F. Cox referred all pretrial matters to the undersigned on August 16, 2018.  (ECF No. 19.)  Generally, the Court will not hold a hearing on a motion in a civil case in which a party is in custody.  *See* E.D. Mich. L.R. 7.1(f).  Here, the

---

[1] Cooke's only response to CMH and Slusher's summary judgment motion was to argue that it was tardy, and that he therefore did not need to provide a substantive response.  (ECF No. 61.) However, CMH and Slusher had timely moved, and provided good cause, for an extension, namely Cooke's "extensive record of 'Kites' for medical services."  (ECF No. 56, PageID.690.) Moreover, these defendants only requested a brief extension, and Cooke did not file a response to their motion requesting an extension.  On January 21, 2020, the Court entered an order granting the motion for extension, and giving Cooke until February 5, 2020, to file a merits-based opposition to the summary judgment motion.  (ECF No. 61.)  However, Cooke failed to file a response.  At any rate, the salient records and other evidence do not appear to be in dispute, and at Cooke's deposition he insisted on placing his side of the events into the record even though that testimony was non-responsive to defense counsel's questions.  (ECF No. 55-2 ("Cooke dep.") at 94, 96 (". . . you're asking something, and I wanted something to be on record as well.  And I have a right to put it on the record. . . . Well, I am [answering your question], but I'm going to make a record, too. . . . Well, as you get your little thing along, I'm going to say what I've got to say in my defense.  Because, like I said, you're not just going to pull all offense on me and me not put no defense up.").

2

Court finds that the facts and legal issues are adequately presented in the briefs and on the record, and it declines to order a hearing at this time.

**A.     Factual Background**

Cooke was incarcerated as a pretrial detainee at the Jail from November 1, 2017, to June 28, 2018, and his claims against the moving defendants arise from his requests for mental health treatment at the Jail and grievances he wished to file during that period.

Although Cooke takes exception with certain decisions made by those who evaluated him, the salient records and events are not in dispute. Prior to Cooke entering the Jail on November 1, 2017, he had been prescribed various medications to treat his mental health conditions. (Cooke dep. at 50-53.) Those medications, at least one of which was an anti-psychotic, were prescribed for Cooke when he was an inmate at the Sanilac County Jail. (*Id.* at 51-56, 73.) In December of 2016, as Cooke was nearing the end of his custodial sentence at that facility, he requested that he be taken off his medications, and the prison physician discontinued them. (*Id.* at 57-58, 67.) For the most part, between his release and entry into the Jail, Cook was not on medication, but would "self-medicate" by smoking marijuana "every day all day." (*Id.* at 58-63, 68.)

When Cooke arrived at the Jail on November 1, 2017, a medical screening form was completed by Jail personnel, which Cooke signed. (*Id.* at 68-73; ECF No. 58-6.) Although Cooke now disputes some of the form's contents, he admits that he did not tell the screener that he was depressed or suicidal at the time because he had not yet been charged with a crime. (Cooke dep. at 69-72.) Instead, Cooke contends that he told the screener that he had been on Trazadone and Effexor at the prior facility, and that he needed the medications. (*Id.* at 69-73.)

As a result of Cooke's answers to the screener's questions, the Jail's nursing staff contacted the other facility, verified Cooke's prescriptions, and began providing him those medications on

November 9, 2017 (*Id.* at 73; Exhibit 4, pp. 1-2).  Also on November 9, 2017, a CMH employee, "Alexis," screened Cooke to determine his eligibility for mental health services.  (ECF No. 55-8; Cooke dep. at 80.)  The screener noted that Cooke presented with a "stable mood," was "lucid" with no "delusional content," was "oriented x3," and was "cooperative."  (ECF No. 55-8, PageID.584.)  Cooke admits he was cooperative and that he told the screener he was not suicidal and had never been hospitalized for a psychiatric problem.  (Cooke dep. at 82-83.)  As a result of the screening, Alexis determined that Cooke's mental health status was "not severe" and thus he did not meet the criteria ("DNMC," per the record) for mental health treatment other than assisting him with obtaining his medications.  (ECF No. 55-8, PageID.585; ECF No. 55-6, PageID.461.)

Over the next month, Cooke sent numerous kites requesting to file grievances about issues unrelated to his medical needs, such as concerns about his access to the law library and not being provided washcloths.  (ECF No. 55-6, PageID.462-471.)  Jail staff advised Cooke that the law library was temporarily "out of service for updating" but would be available a few days later – and Cooke admits (and records show) that he was permitted to use the law library.  (*Id.*, PageID.463; Cooke dep. at 174, 212-13; ECF No. 55-9.)  Cooke's requests for washcloths were denied.  (ECF No. 55-6, PageId.470.)  A Jail lieutenant advised Cooke that his request for a washcloth was not a grievable issue.  (*Id.*)

In December 2017, Cooke refused to take his prescribed medications over a period of days, and, pursuant to the Jail's policy, the medications were therefore stopped effective December 16, 2017.  (Cooke dep. at 75, 77-78; ECF No. 55-6, PageID.479).  Although Cooke contends that he stopped taking the medications because one of them made him sick, at his deposition he admitted telling Jail personnel and Alexis of CMS that he stopped taking the medications because he wanted to hide his cigarette use and believed that the deputy present during "med line" would detect the

4

cigarette smoke odor.  (Cooke dep. at 75-77, 93-94; ECF No. 55-10.)  Also on December 16, 2017, Cooke received a 45-day disciplinary lockdown because he was caught tampering with an electrical outlet trying to create a spark.  (Cooke dep. at 174, 193.)

Over the next few days, Cooke sent multiple kites to the nurse requesting that his medication be reinstated.  (ECF No. 55-6, PageID.472-480.).  In one of the kites, which Cooke submitted around 10:00 p.m. on December 18, 2017, he claimed he was "having bad thoughts of doing things" and asked, "please let me have my medication back before I carry out these thoughts!"  (*Id.*, PageID.475.)  Based on Cooke's statements, Alexis from CMH re-evaluated him the very next day.  (ECF No. 55-10.)  Although Alexis noted that the reason Cooke was seeing her was because of statements he had made about "possible" self-harm, she found Cooke to be "polite, cooperative, alert, oriented x3" and experiencing only "mild depression."  (*Id.*, PageID.592.)  Accordingly, Alexis did not order any specific mental health treatment for Cooke at that time.  (*Id.*)

Cooke continued submitting kites requesting that his medications be reinstated.  (ECF No. 55-7.)  On January 17, 2018, defendant Slusher, who was a Mental Health Coordination Services Manager with CMH, met with Cooke to again evaluate whether he qualified for CMH services, and Cooke signed an authorization releasing his previous inmate mental health records to CMH.  (ECF No. 55-11.)  Slusher found that Cooke did "[n]ot meet criteria [for additional services] at this time.  Had voluntarily not taken meds to sneak cigarettes & avoid detection.  Also stopped meds at last facility [*i.e.*, the Sanilac jail].  Only expressing anger [without] symptoms of mania or depression. . . . no SI/HI [suicidal or homicidal ideation]."  (ECF No. 55-12, PageID.599.)

On January 23, 2018, Cooke sent a kite requesting a grievance form because he believed he was "being denied [CMH] services at [the Jail]."  (ECF No. 55-6, PageID.493.)  A jail lieutenant responded that same day, saying, "You are not being denied service, you just were seen by CMH

5

on the 17th of January and gave them permission to look into records from another place. They are working on trying to get said records, this takes time. It is not something that will be resolved in a day. Please be patient with CMH." (*Id.*).

Unsatisfied, on January 24, 2018, Cooke sent another kite, asserting, "I am depressed and its [sic] getting worst [sic] I'm getting thoughts of trying to turn this place into a slaughter house and start stabbing!!!!! I lost all patience as to be denied mental health treatment and my medications that I need to function !!!!!!!!" (ECF No. 55-7, PageID.540.) At that time, Cooke was still on "lockdown" status as a result of jail rule violations he had committed. (Cooke dep. at 120, 193). In light of Cooke's reference to physical violence, a Jail sergeant advised Cooke that he would be placed in an observation cell and maintained on "lockdown." (*Id.* at 120). On January 27, 2018, Cooke sent a kite in which he retracted his threat, saying he was not really having the thoughts he had professed, that he was "doing OK," having a "positive attitude" and "thinking positive things," and that he had sent the threatening kite only because he wanted to get back on his medication. (ECF No. 55-7, PageID.541; Cooke dep. at 119-121, 196-97.) At his deposition, Cooke did another about-face, claiming his retraction was a lie, but he does not contend that CMH or Slusher knew this. (Cooke dep. at 119-121, 196-97.) On January 29, 2018, Slusher completed a screening form in which he concurred with CMH's prior assessment that Cooke did not meet the criteria for services. (ECF No. 55-12.)

On February 17, 2018, at 12:07 p.m., Cooke sent a kite stating, "… I need help from mental health it should not have to come to me having a mental breakdown and go off the wall!!! Say if I was to fly off and hurt someone then whos [sic] fault would it be !???" (ECF No. 55-7, PageID.544.) Just ten minutes later, Cooke sent a kite to a Jail sergeant, indicating that he wanted to file a grievance against CMH to "get help with my mental illnesses!!" (ECF No. 55-6,

PageID.497.) The Jail sergeant responded a few hours later, "CMH has been in contact with you on 11-9-17, 12-19-17, 1-17-18 and 1-25-18." (*Id.*) After Cooke sent another kite, the Jail sergeant responded, "CMH has reviewed your records and you are not eligible for CMH services. Have you kited to see the medical doctor for your symptoms?" (*Id.*, PageID.498.)

Cooke sent more kites the next day, demanding to be allowed to file a grievance about his medication, and again contending, "I need help from mental health not a doctor!!" (*Id.*, PageID.498-99.) Szelog admits that on the same day, he met with Cooke and explained that CMH already considered and denied his request for the treatment he was requesting. (ECF No. 55-13, PageID.604). Szelog contends, and Cooke does not deny, that Szelog told Cooke, "You threatened to go off or have a break down to try to prove you needed mental health treatment and I told you if you do, I would have to put you on lock down for your own protection and the protection of those around you. . . . You responded, 'we are done with it,' and I said 'fine.'" (*Id.*)

CMH continued its evaluations of Cooke, with Slusher screening Cooke again on February 21, 2018, to determine whether he was eligible for CMH services. (ECF No. 55-14.) At this meeting, Cooke requested a second opinion. (Cooke dep. at 125, 128-129). Slusher granted Cooke's request, and agreed to consult with "Access," meaning Cooke's own provider – Health MI Plan-Blue Cross ("Blue Cross"). (ECF No. 55-14; ECF No. 55, PageID.709.) On February 28, 2018, Slusher again met with Cooke to screen him. (ECF No. 55-15.) He advised Cooke that Blue Cross had "chosen not to authorize him for services," after which Cooke became upset and walked away. (*Id.*; ECF No. 58-12, PageID.862 (Blue Cross record dated February 26, 2018, which finds that although Cooke reported mania and psychosis, he was "displaying non[e] of these other than verbal agitation.").)

Cooke wrote to CMH a few times over the next few weeks, requesting a form to appeal CMH's decision. (ECF No. 55-7, PageID.550-53, 557.) Alexis from CMH screened him again on March 16, 2018. (ECF No. 58-7). Although Cooke reported suffering from increased depression, Alexis observed him playing cards and socializing. (*Id.*) During the evaluation, Cooke was alert, cooperative, and denied any suicidal ideation. (*Id.*; Cooke dep. at 138-139). Alexis emailed medical staff regarding restarting his medication and forwarded Cooke's concerns to her supervisor. (*Id.*) A jail doctor met with Cooke and again determined he did not have a medical need for the medication. (Cooke dep. at 141).

Blue Cross evaluated Cook again on March 26, 2018, and Cooke reported that he was having thoughts of harming himself or others. (ECF No. 55-16; Cooke dep. at 132, 141-150.) He also told Blue Cross that he had previously been hospitalized for mental health needs, which was contrary to what he had previously told Blue Cross. (ECF No. 55-16, PageID.618.) At that time, Blue Cross determined that Cooke was eligible for mental health services; two days later Cooke had an intake appointment, followed by an initial assessment on April 2, 2018, and a full psychiatric evaluation on April 12, 2018. (ECF No. 55-16-18.) Cooke was also restarted on Effexor and Trazodone (ECF No. 55-19; Cooke dep. at 161-162.).

Cooke was transferred to the state prison system on June 28, 2018. (Cooke dep. at 164). He then commenced the instant action. Defendants now move for summary judgment.

**B.    Standard of Review**

Pursuant to Federal Rule of Civil Procedure 56, the Court will grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Pittman v. Cuyahoga County Dep't of Children & Family Servs.*, 640 F.3d 716, 723 (6th Cir. 2011). A fact is material if it might affect

the outcome of the case under governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether a genuine issue of material fact exists, the Court assumes the truth of the non-moving party's evidence and construes all reasonable inferences from that evidence in the light most favorable to the non-moving party. *See Ciminillo v. Streicher*, 434 F.3d 461, 464 (6th Cir. 2006). In response to a summary judgment motion, the opposing party may not rest on its pleadings, nor "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact but must make an affirmative showing with proper evidence in order to defeat the motion." *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009)(internal quotations omitted).

At the summary judgment stage, the ultimate question is "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Amway Distributors Benefits Ass'n v. Northfield Ins. Co.*, 323 F.3d 386, 390 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 251-52). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247-48 (emphasis in original); *see also National Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 907 (6th Cir. 2001). Put another way, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

**C.     Analysis**

The three individual defendants, Donnellon, Szelog and Slusher, all argue that Cooke failed to raise a material question of fact as to his Eighth Amendment deliberate indifference claims. (ECF No. 55, PageID.296-301; ECF No. 58, PageID.712-20.) Defendants Donnellon and Szelog additionally argue that Cooke failed to raise a material question of fact as to his First Amendment

retaliation claims (ECF No. 55, PageID.301-304), and his Fifth and Fourteenth Amendment claims. (ECF No. 55, PageID.301-302.)[2]

> 1.   *Cooke's Eighth Amendment Deliberate Indifference Claims Fail*

Cooke claims that "Tim Donnellon, Bill Slusher and David Szelog's deliberate indifference to [his] serious medical needs violated [his] rights and constituted cruel and unusual punishment under the Eighth Amendment." (ECF No. 17, PageID.64.) "Where prison officials are so deliberately indifferent to the serious medical needs of prisoners as to unnecessarily and wantonly inflict pain, they impose cruel and unusual punishment in violation of the Eighth Amendment." *Horn by Parks v. Madison Cnty. Fiscal Court*, 22 F.3d 653, 660 (6th Cir. 1994), *cert. denied*, 513 U.S. 873 (1994) (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)).

The Sixth Circuit has explained the standards that a plaintiff must satisfy to state a claim for deliberate indifference to his serious medical needs:

> A claim of deliberate indifference under the Eighth Amendment has both an objective and a subjective component. The objective component requires the existence of a sufficiently serious medical need. To satisfy the subjective component, the defendant must possess a "sufficiently culpable state of mind," rising above negligence or even gross negligence and being "tantamount to intent to punish." Put another way, "[a] prison official acts with deliberate indifference if he knows of a substantial risk to an inmate's health, yet recklessly disregards the risk by failing to take reasonable measures to abate it." Mere negligence will not suffice. Consequently, allegations of medical malpractice or negligent diagnosis and treatment generally fail to state an Eighth Amendment claim of cruel and unusual punishment.

*Broyles v. Correctional Medical Servs., Inc.*, 478 F. Appx. 971, 975 (6th Cir. 2012) (internal citations omitted).

---

[2] Defendants Donnellon and Szelog also argue that they are entitled to qualified immunity because Cooke failed to allege how they acted unreasonably or violated any constitutional right. (ECF No. 55, PageID.304-06.) However, because the Court finds that Cooke failed to raise a genuine issue of material fact on the merits of his claims, the Court declines to separately consider the qualified immunity issue. .

A serious medical condition is "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2nd Cir. 1994). "The objective prong asks whether the harm inflicted by the conduct is sufficiently serious to warrant Eighth Amendment protection." *See Hudson v. McMillian*, 503 U.S. 1, 8-9 (1992); *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981). The Sixth Circuit has held that "[a] detainee's psychological needs may constitute serious medical needs, especially when they result in suicidal tendencies." *Horn by Parks*, 22 F.3d at 660 (6th Cir. 1994).

With regard to the objective component, Cooke argues that his serious medical need stemmed from his "severe depression, anxiety, and manic depressive bipolar disorder." (ECF No.17.) It is undisputed that prior to his incarceration at the Jail, Cooke had been diagnosed with these conditions. (ECF No. 55-2, PageID.324). While defendants point to the fact that Cooke provided contrary statements bearing on the question of whether or not he suffered from a serious health condition (*see, e.g.*, ECF No. 17, PageID.63; ECF No. 55, PageID.286-295; ECF No. 58, PageID.701-11), and he sometimes refused medications, the nature of Cooke's purported mental illness suggests that his own statements cannot conclusively determine the existence of a serious mental impairment. Given the foregoing, the Court will assume, for purposes of the instant motions, that Cooke's mental health issues satisfy the objective component of his Eighth Amendment claim.

However, Cooke cannot establish a genuine dispute of material fact as to the subjective component of his Eighth Amendment claim. The subjective component is "meant to prevent the constitutionalization of medical malpractice claims; thus, a plaintiff alleging deliberate indifference must show more than negligence or the misdiagnosis of an ailment." *See Comstock v. McCrary,* 273 F.3d 693, 703 (6th Cir. 2001). As discussed herein, the undisputed record

evidence establishes that this is a case where the "prisoner has received some medical attention and the dispute is over the adequacy of the treatment . . ." *Westlake v. Lucas*, 537 F.2d 857, 860, n 5 (6th Cir. 1976). Thus, Cooke raises at most a claim of medical malpractice which is not actionable under the Eighth Amendment. *See Comstock*, 273 F.3d at 703 (holding that where a provider "provides treatment, albeit carelessly or inefficaciously, to a prisoner, he has not displayed a deliberate indifference to the prisoner's needs, but merely a degree of incompetence which does not rise to the level of a constitutional violation.").

    *a.*    *Sherriff Donnellon*

Sherriff Donnellon was not involved in Cooke's medical treatment at all. Indeed, Cooke's allegations against Donnellon essentially stem from his bare assertion that "Donnellon is responsible for the orderly [sic] of the St. Clair County Jail." (ECF No. 17.) In Section 1983 proceedings the plaintiff must make a clear showing that the defendant was personally involved in the activity that forms the basis of the complaint. *See Rizzo v. Goode*, 423 U.S. 362, 377 (1976); *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir. 1984). Moreover, Section 1983 liability cannot be premised upon mere allegations of *respondeat superior*, *i.e.*, supervisory liability; rather, a defendant can only be liable under §1983 if the plaintiff shows that he personally participated in, or otherwise authorized, approved, or knowingly acquiesced in, the allegedly unconstitutional conduct. *See Monell v. Dep't of Soc. Svcs.*, 436 U.S. 658, 691 (1978); *Bellamy*, 729 F.2d at 421. A supervisory official's mere awareness of a complaint of allegedly illegal conduct, and his subsequent failure to take corrective action, are insufficient to trigger §1983 liability. *See Poe v. Haydon*, 853 F.2d 418, 429 (6th Cir. 1988). In other words, liability under §1983 must be based upon active unconstitutional behavior, not a "mere failure to act." *Shehee v. Luttreell*, 199 F.3d 295, 300 (6th Cir. 1999) (internal quotations omitted). There has been no such showing here.

(ECF No. 17.) Cooke did not come forward with any evidence that Donnellon knew about his alleged serious medical needs. (ECF No. 17.) At any rate, as discussed above, the record evidence shows that Cook's condition and needs were being addressed, albeit not in a manner Cooke thought was appropriate. As such, no material question of fact exists with regard to Donnellon's lack of involvement with Cooke's medical needs, and, Donnellon is entitled to summary judgment as to Cooke's Eighth Amendment claim.

    *b.*    *Sergeant David Szelog*

Likewise, Cooke fails to show the requisite subjective intent on the part of Sergeant David Szelog with regard to his Eighth Amendment claim. "[T]he deliberate indifference threshold is higher for correctional officers where, as here, an inmate is receiving medical treatment—there must be some reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner." *See Shaver v. Brimfield Twp*., 628 F. App'x 378, 383 (6th Cir. 2015). This heightened standard exists because otherwise, in order to insulate himself from liability, a corrections officer untrained in medicine would be required to second-guess the medical or health care professionals' judgment with respect to a particular inmate's medical care.

Cooke fails to present any evidence that would meet this standard with respect to Szelog. The only salient date Cooke points to with respect to Szelog is February 18, 2018. As of that time, Cooke had just been evaluated by CMH staff who determined that he did not meet their requirements for mental health treatment. In answering Cooke's interrogatories about the date in question, Szelog explained, "I spoke to you in person and told you that CMH had already denied your request. . . . You threatened to go off or have a break down to try to prove you needed mental health treatment and I told you that if you do, I would have to put you on lock down for your own protection and the protection of those around you. . . . You responded, 'we are done with it", and

I said 'fine.'" (ECF No. 55-13, PageID.604). Cooke does not dispute these facts which do not constitute deliberate indifference because they specifically reflect that Szelog was relying on the opinions that medical professionals had just made about Cooke's need for the services he was requesting and Cooke's admitted ploy to obtain the relief he wanted. *See Hubble v. Cty. of Macomb*, No. 2:16-CV-13504, 2019 WL 1778862, at *15 (E.D. Mich. Apr. 23, 2019) ("Corrections officers are entitled to rely on the medical judgment of prison healthcare providers and 'commit[ ] no act of deliberate indifference in adhering to [the] advice' of a medical professional because 'nonmedical jail personnel are entitled to reasonably rely on the assessments made by the medical staff.'") (quoting *Winkler v. Madison Cty.*, 893 F.3d 877, 890-91 (6th Cir. 2018) and *Spears v. Ruth*, 589 F.3d 249, 255 (6th Cir. 2009)). Accordingly, Szelog is entitled to summary judgment on Cooke's Eighth Amendment claim.

    *c.    Bill Slusher*

Cooke also failed to raise a material question of fact that Slusher, the director of St. Clair County CMH, was deliberately indifferent to his serious medical needs. The records detailed above indisputably show that Slusher assessed Cooke for his mental health multiple times after he made requests for treatment. (ECF No. 55-2, PageID.338.) They also show that Slusher granted Cooke's requests for appeals (which, at least initially, were also denied), which also weighs against a finding that Slusher was deliberately indifferent to Cooke's medical needs.

In his response brief,[3] Cooke argues that he had previously been diagnosed with severe depression and that his only "real evaluation" was Blue Cross' second evaluation, which resulted in a determination that he qualified for the treatment he wanted. (ECF No. 59, PageID.879.) Those

---

[3] In his response to the summary judgment motion filed by Donnellon and Szelog, Cooke addressed some of his claim against Slusher. (ECF No. 59, PageID.879.)

14

arguments do not change the analysis. Cooke cites no law that merely because he had been diagnosed as having a mental health condition a few years earlier necessarily meant he still had that condition at the time in question. More importantly, Cooke does not explain how a years' old diagnosis proves that Slusher's evaluation of Cooke's then-present condition was inaccurate, let alone that Slusher was deliberately indifferent to his needs at the time. Finally, that Blue Cross' second evaluation yielded a result that Cooke agreed with does not mean Blue Cross' first evaluation, or the many evaluations performed by Slusher and CMH, were not "real" evaluations. Those various evaluations were performed at different times, by different professionals, and were based on different information (both necessarily because of the passage of time and because Cooke provided conflicting information, *see supra* at 4, 8).[4] At most, this shows a difference of opinion about Cook's treatment needs, which does not amount to deliberate indifference under the Eighth Amendment. *See Witek v. Washington*, No. 2:17-CV-13647, 2019 WL 3422938, at *8 (E.D. Mich. June 22, 2019), report and recommendation adopted sub nom. *Witek v. Anderson*, No. 17-13647, 2019 WL 3413199 (E.D. Mich. July 29, 2019) (holding that a difference of opinion between various medical professionals about an inmate's medical needs at most raised questions of medical negligence, not deliberate indifference).

At bottom, while Cooke argues that Slusher's determinations that he did not require mental health treatment were erroneous, ultimately, that argument is nothing more than a disagreement about Slusher's judgment of Cooke's treatment needs, which is not actionable under the Eighth Amendment. *Westlake*, 537 F.2d at 860, n 5; *Comstock*, 273 F.3d at 703. Accordingly, Slusher is entitled to summary judgment on Cooke's Eighth Amendment claim.

---

[4] Cooke also admits that he was unsure of the "criteria" Blue Cross was using to evaluate him, and thus, whether that criteria differed from the criteria Slusher had used. (Cooke dep. at 145.)

*2.     Cooke's First Amendment Retaliation Claim Against Defendant Szelog Fails*

Cooke claims that Szelog violated his First Amendment rights by "threatening [him] with discipline for exercise of his right to seek redress from the jail through use of the jail grievance system." (ECF No. 17, PageID.65.) As with his deliberate indifference claim against Szelog, Cooke's instant claim is based on the events of February 18, 2018. The undisputed record shows that Cooke had just been evaluated by CMH staff who determined that he did not meet their requirements for the type of mental health treatment he was requesting. The record also shows that Cooke had already admitted that just a few days earlier, he made threats of physical violence as a ploy to obtain that treatment. (ECF No. 55-7, PageID.541.) Szelog admits advising Cooke that if he engaged in that conduct, he "would have to put [him] on lock down for [his] own protection and the protection of those around [him]." (ECF No. 55-13, PageID.604.)

A prima facie case for First Amendment retaliation involves three elements: (1) the plaintiff participated in constitutionally-protected activity; (2) the defendant took an adverse action against the plaintiff "likely to chill a person of ordinary firmness" from engaging in the protected conduct; and (3) there is a causal connection between elements one and two – that is, "that the adverse action was motivated at least in part by the plaintiff's protected conduct." *Scarbrough v. Morgan Cnty. Bd. of Educ.*, 470 F.3d 250, 255 (6th Cir. 2006) (citing *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc)). The analytical approach in these cases is "intensely context-driven," and while the elements remain constant between cases, "the underlying concepts that they signify will vary with the setting." *Holzemer v. City of Memphis*, 621 F.3d 512, 520 (6th Cir. 2010). For this reason, whether conduct is "protected," or an official's responsive action is "adverse" frequently turns on the particular facts of a case. *Id.* (citing *Thaddeus-X*, 175 F.3d at 397).

Taking Cooke's facts as true, as the Court must at this stage, it will assume that he satisfies the first two prongs of a First Amendment retaliation claim. He at least arguably engaged in protected conduct by complaining about what he perceived was a lack of necessary medical care, and "placing a prisoner in administrative segregation or in a similar facility is an adverse action." *Cousins v. Rogers*, No. 3:18-cr-00026-GFVT-HAI, 2019 WL 3854684, at *7 (E.D. Ky. Aug. 16, 2019). *See also Thaddeus-X*, 175 F.3d at 398 (finding that "[h]arassment, physical threats, and transfer to the area of the prison used to house mentally disturbed inmates" constitutes adverse action).

However, Cooke's claim fails on the third prong because he did not raise a genuine dispute of material fact that Szelog's conduct was motivated by Cooke's engagement in the protected activity. In his interrogatory response, which Cooke does not challenge, Szelog wrote, "You threatened to go off or have a break down to try to prove you needed mental health treatment and I told you if you do, I would have to put you on lock down for your own protection and the protection of those around you. . . . You responded, 'we are done with it', and I said 'fine'." (ECF No. 55-13, PageID.604.) Thus, Szelog merely advised Cooke that if he actually engaged in behavior that was dangerous to himself or others, he would be placed in lockdown. Cooke failed to raise a material question of fact that the alleged adverse action was motivated by his speech rather than the threat that would be posed by *future* potentially harmful conduct. Further, the Court agrees with Szelog that advising an inmate that he could be placed in lockdown if he engaged in behavior that could be harmful to himself or others is reasonably related to legitimate penological concerns, *i.e.*, prison safety, and therefore not a violation of Cooke's rights. *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 349 (1987). Accordingly, Cooke's First Amendment retaliation claim fails at the summary judgment stage.

> 3.   *Cooke's Constitutional Claims Related to the Denial of Grievance Forms Fail*

Cooke also argues that Donnellon and Szelog violated his rights under the First Amendment, as well as his due process rights under the Fifth and Fourteenth Amendments by denying certain of his requests for grievance forms. (ECF No. 17.) This claim lacks merit.

The record clearly establishes that, separate and apart from the grievance forms at issue in this claim, the Jail provided him a means of voicing complaints about the conditions of his confinement. Cooke does not dispute that he was permitted to kite his complaints to the Jail deputies and sergeants. Rather, he complains that he was sometimes denied access to the next step in the Jail's system for prisoner complaints – a "grievance" form which would go to a more senior Jail official. As Defendants argue, this shows Cooke's "actual complaint is that he did not have the right to take his prolific use of the grievance process past the level of Sergeant to the level of Lieutenant." (ECF No. 55, PageID.301.) But Cooke had no *constitutional* right to advance his complaints in that manner.

In *Curtis v. St. Clair, County of*, No. 1:17-cv-13775, 2018 WL 3405412, at *4 (E.D. Mich. June 13, 2018), *affirmed*, 2018 WL 3738098, at *4 (E.D. Mich. Aug. 7, 2018), the court considered a similar challenge to the Jail's procedures. In that case, the plaintiff "allege[d] that County of St. Clair [] limited prisoner access to grievances . . ." Citing to cases holding that inmates have "no inherent constitutional right to an effective prison grievance procedure," the court found that the "grievance-policy allegations fail to set forth a colorable claim for relief." *Id.* (quoting *Young v. Gundy*, 30 Fed. App'x. 568, 569-70 (6th Cir. 2002). *See also Groomes v. Parker*, No. 08-2028-AN/P, 2008 WL 4057763, at *5 (W.D. Tenn. Aug. 26, 2008) (holding that an inmate "cannot sue any defendant for refusing to give him a grievance form, or for improperly handling or processing his grievances, because there is no cause of action for the improper adjudication of, or failure to

adjudicate, an inmate's grievances."). *See also Bills v. McKeon*, No. CV 15-11414, 2017 WL 460739, at *6 (E.D. Mich. Jan. 4, 2017) ("inmates have no constitutional right to effective grievance procedures."); *Easterly v. Budd*, No. 4:06 CV 00186, 2006 WL 2404143, at *7 (N.D. Ohio Aug. 18, 2006) ("[A]ll circuits to consider this issue have found that there is no constitutionally protected due process right to unfettered access to prison grievance procedures.").

Finally, a jail officer's failure to follow the jail's own procedural rules is not a matter of federal due process. *See Sweeton v. Brown*, 27 F. 3d 1162, 1165 (6th Cir. 1994) (en banc); *Coleman v. Martin*, 363 F. Supp. 2d 894, 903 (E.D. Mich. 2005). Thus, "any claim based on an alleged failure to follow the [Jail's] own internal procedures fails as a matter of law." *Bills*, 2017 WL 460739, at *6. Accordingly, Donnellon and Szelog are entitled to summary judgment on Cooke's claims that certain of his requests for grievance forms were denied.

## II. RECOMMENDATION

For the foregoing reasons, the Court **RECOMMENDS** that defendants Donnellon and Szelog's motion for summary judgment **(ECF No. 55)** and defendant Slusher's motion for summary judgment (**ECF No. 58)** be **GRANTED**, and that this case be **DISMISSED**.

Dated: February 14, 2020       s/David R. Grand
Ann Arbor, Michigan       DAVID R. GRAND
     United States Magistrate Judge

## **NOTICE TO THE PARTIES REGARDING OBJECTIONS**

Within 14 days after being served with a copy of this Report and Recommendation and Order, any party may serve and file specific written objections to the proposed findings and recommendations and the order set forth above. *See* 28 U.S.C. §636(b)(1); Fed. R. Civ. P.

72(b)(2); E.D. Mich. LR 72.1(d)(1). Failure to timely file objections constitutes a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140, (1985); *United States v. Sullivan,* 431 F.3d 976, 984 (6th Cir. 2005). Only specific objections to this Report and Recommendation will be preserved for the Court's appellate review; raising some objections but not others will not preserve all objections a party may have. *See Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987); *see also Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596-97 (6th Cir. 2006). Copies of any objections must be served upon the Magistrate Judge. *See* E.D. Mich. LR 72.1(d)(2).

A party may respond to another party's objections within 14 days after being served with a copy. *See* Fed. R. Civ. P. 72(b)(2); 28 U.S.C. §636(b)(1). Any such response should be concise, and should address specifically, and in the same order raised, each issue presented in the objections.

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on February 14, 2020.

s/Eddrey Butts<br>
Eddrey Butts<br>
Case Manager